[No. F011935. Fifth Dist. Oct. 9, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD RAY DYKE et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

James T. Wilson and Donna L. Hall, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Maureen A. Daly and Thomas F. Gede, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.—**

### INTRODUCTION

Appellants Donald Ray Dyke (prosecuted in superior court under an alias of John Michael Fitzpatrick) and Richard Lee Garland were arrested for drug offenses on November 13, 1988, in room 116 at the Economy Inn in Bakersfield where contraband was seized as police officers were attempting to execute a felony arrest warrant on burglary suspect Kenneth DeBenedict. Additional contraband was later seized at appellants' residences, which were searched by authority of warrants. Appellants' motions to suppress (Pen. Code, § 1538.5)[1] were denied by the superior court "as to everything except the duffel bag and the Crown Royal Bag[,] which are granted."

Garland pled guilty to the following charges contained in an amended information filed February 7, 1989: count 1, possession for sale of

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

methamphetamine (Health & Saf. Code, § 11378); count 2, possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)); count 3, possession of base or "rock" cocaine (Health & Saf. Code, § 11350, subd. (a)); count 4, conspiracy to violate Health and Safety Code section 11378, with eight overt acts alleged (§ 182, subd. 1); and count 5, possession of less than 28.5 grams of marijuana, a misdemeanor (Health & Saf. Code, § 11357, subd. (b)). Garland admitted being armed with a firearm (§ 12022, subd. (a)) in the commission of counts 1 through 3 and possessing for sale 28.5 grams or more of a substance containing methamphetamine (§ 1203.073, subd. (b)(2)) in the commission of count 1. Garland was sentenced to state prison for a total term of four years, eight months.

Dyke had a jury trial. He was acquitted on count 1 of possession for sale of methamphetamine (Health & Saf. Code, § 11378) and on count 2 of possession of base or "rock" cocaine (Health & Saf. Code, § 11350, subd. (a)). The jury found Dyke guilty on count 3, conspiracy to possess for sale methamphetamine (§ 182, subd. 1) and found true the eight overt acts alleged.[2] It also found him guilty on count 4, misdemeanor possession of marijuana (Health & Saf. Code, § 11357, subd. (b)).

Dyke, an escapee from an Oklahoma state prison, was sentenced to state prison for a total term of three years, to "be served consecutive to whatever time must be served by this defendant in the Oklahoma proceedings."

Both appellants claim on appeal that the superior court erred in not suppressing all of the contraband. Additionally, Dyke claims (1) the conspiracy guilty verdict (count 3) must be set aside because it is inconsistent with the not guilty verdict on count 1, and (2) the court violated California Rules of Court, rule 451(b) by failing to order his consecutive term to commence upon completion of the Oklahoma sentence.

---

[2] The overt acts, all occurring "[o]n or about November 13, 1988," admitted by Garland and proved in Dyke's trial were:

1. " . . . [Donald Ray Dyke] and/or Richard Lee Garland possessed approximately two pounds of methamphetamine at a motel room in Bakersfield."

2. " . . . [Donald Ray Dyke] and/or Richard Lee Garland possessed a loaded Ruger .357 magnum revolver and a loaded Titan .380 caliber semi-automatic handgun."

3. " . . . [Donald Ray Dyke] possessed over $2,000.00 in United States currency."

4. " . . . Rae Lynn Upchurch [an uncharged coconspirator] possessed a Regency scanner broadcasting Bakersfield Police transmissions."

5. " . . . Rae Lynn Upchurch possessed an Ohaus triple-beam scale."

6. " . . . Barbara Denise Garland [an uncharged coconspirator] possessed a pay and owe sheet."

7. " . . . Barbara Denise Garland possessed an envelope with the numbers '124 Panama Lane Economy' written on it."

8. " . . . Barbara Denise Garland possessed an Ohaus scale."

## FACTS

Police officers gave Adeline Marie Griffin, the motel manager of the Economy Inn in Bakersfield, a photograph of a fugitive burglary suspect named Kenneth DeBenedict. There was an outstanding felony warrant for his arrest. They requested her assistance in the event he was observed at the motel. A few days later, on November 13, 1988, Garland came into the office, completed the registration form, and rented room 116.

Griffin observed that Garland was accompanied by a "gentleman on [a] motorcycle." Garland admitted "there might be somebody" staying in the room and paid the rate for double occupancy. Griffin watched Garland and the man on a motorcycle enter room 116. Griffin thought the man "on a motorcycle" closely resembled DeBenedict, but she was not positive because he was wearing sunglasses and did not enter the motel's office. Their conduct appeared "suspicious."

She telephoned the police and reported her suspicion that DeBenedict had just entered room 116. This information was communicated to other officers (Sgt. Hartshorn and Officers Steven London, Lonnie Mills, and Stephen Horst) who were immediately dispatched to the motel to execute the felony arrest warrant on DeBenedict.

In court, Griffin identified Dyke as the man who resembled DeBenedict.

Officers London and Mills proceeded to room 116, while Sergeant Hartshorn and Officer Horst positioned themselves nearby. They did not check the registration card for room 116 or otherwise attempt to identify its occupants beforehand because, according to Mills, "It was known that DeBenedict very seldom registered under his own name." Someone inside the room opened the curtains, looked out the window, and promptly closed them. The officers, who were in uniform, knocked on the door and announced they were police officers. They heard commotion and some conversation coming from inside the room. Officer Mills overheard one of the occupants state, "It is the fucking pigs." After approximately one minute, Dyke partially opened the door.

Officer Mills advised Dyke that they were looking for DeBenedict because he was wanted for burglary on a felony arrest warrant. Dyke said he did not know DeBenedict. Dyke acted nervous and communicated in an uncooperative tone of voice. The officers saw a large caliber handgun "within arm's reach" of Dyke that appeared to be loaded. It was on a desk dresser inside the motel room. Officer Mills was concerned Dyke "might try to make a move for it." The officers entered the motel room to secure the

weapon "for officer safety." Mills positioned himself to block Dyke from the handgun while London secured and unloaded it, a Ruger .357 magnum revolver. The officers saw marijuana, a large amount of currency, and .22-caliber bullets in plain view on the bed.

Noticing the bathroom door was closed, Officer Mills asked Dyke if there was anyone else present. He responded, "Yes. A friend of mine is in the bathroom." Mills asked, "What's his name?" Dyke said he did not know. After some delay, Garland finally partially opened the door and exited the bathroom at the officers' request. The officers conducted a cursory patdown search of Garland. Officer London observed a large bulge in a black leather jacket lying on the bed and found a loaded Titan .380-caliber semiautomatic handgun in a pocket.

The officers were aware of DeBenedict's appearance and observed that neither Dyke nor Garland was DeBenedict, the subject of their felony arrest warrant. Officer London entered the bathroom and looked behind the partially closed bathroom door and closed shower curtain, places where DeBenedict or others might be secreted. He detected a strong chemical odor coming from an open paper bag sitting on the bathroom floor between the toilet and the bathtub. He observed methamphetamine inside the bag, later weighed at 432.70 grams. It also contained rock cocaine and a small amount of marijuana.

Appellants were arrested, removed from the room, and later transported to jail by other officers. Officers London and Mills continued their search for a .22-caliber handgun they suspected was in the motel room. Their suspicion was based on the presence of the .22-caliber ammunition and its incompatibility with the handguns found. The officers expressed public safety as justification for the search. Officer London testified, "The subjects were going to be vacated out of the room, and we understood that a .22 caliber handgun was still inside the room. For public safety, knowing this room was going to be vacated, we continued the search." Officer London lifted the toilet seat and found in the toilet a large baggie containing methamphetamine, later weighed at 425.03 grams. Officer Mills found contraband in a duffel bag and in a Crown Royal bag, searches which the court expressed concern over during argument at the suppression hearing. The court stated, "Could he have not taken the bags out and gotten a search warrant?" The court later denied the suppression motions, except for the two bags.

Officer Horst searched appellants at the motel parking lot after their arrest and before transporting them to jail. He found approximately $960 in United States currency in Dyke's front pants pocket and $1,950 in currency

in his rear pants pocket. No drugs were found on Dyke's person. Horst found three baggies containing drugs on Garland's person.

Under authority of a warrant, a search of Garland's residence at 210 Decatur Street in Bakersfield was conducted that night. Various items of contraband related to the use and sale of narcotics were seized, including "pay and owe" sheets, an envelope with "124 Panama Lane Economy" written on it, an Ohaus scale, rock cocaine, drug vials, and glass smoking pipes. Barbara Denise Garland was found in a bedroom and appeared to be under the influence of drugs. A baggie containing .28 grams of methamphetamine was seized from her purse.

Officers also executed a search warrant that same night at 209 Decatur, a residence located across the street from Garland's. Rae Lynn Upchurch was in the residence with a small child. Photographs of Dyke and articles of men's clothing, including a T-shirt with "Donny" on it, evidenced Dyke's occupancy. The search uncovered several controlled substances, narcotic paraphernalia in two purses, a mirror with powder residue on top of it, baggies of marijuana in a dresser, a large Ohaus scale in the garage, $349 in currency located in a box in a dresser, a police scanner located in the garage, $3,000 in one of the purses, two handguns, and other miscellaneous items. Kern County criminalists testified they tested the various items of evidence and confirmed the presence of marijuana, rock cocaine and methamphetamine.

Both appellants filed timely notices of appeal.

## DISCUSSION

### I.

### DENIAL OF APPELLANTS' SUPPRESSION MOTIONS.

A. *Standard of review.*

The appellants contend the search of their room at the Economy Inn and subsequent searches of their residences violated their Fourth Amendment rights because police officers failed to first obtain a warrant to search the motel room. The superior court denied the section 1538.5 motions, suppressing only those items found in the Crown Royal bag and a duffel bag. Appellants contend the motions should have been granted for all items found in their room and later in their residences since the search warrant obtained for each appellant's residence was the fruit of the poisonous tree.

(*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

■ The defendant bears the initial burden of showing that police officers acted unlawfully. When the defendant shows that entry was made without a warrant, the burden shifts to the prosecution to prove that it was reasonable. This is usually done by showing exigent circumstances. If the prosecution fails to carry its burden, the defendant need do nothing more to be entitled to suppress primary evidence. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1300 [248 Cal.Rptr. 834, 756 P.2d 221].)

■ The trial court's role in a suppression motion is to make factual findings concerning the history of the events, to select the applicable rule of law, and to apply the law to the facts to establish whether or not there has been a constitutional violation. The trial court's factual findings are reviewed on appeal under the deferential substantial-evidence standard. Its selection of the governing legal principles and its application of those principles, however, are subject to the appellate court's independent review. (*People* v. *Williams, supra,* 45 Cal.3d 1268, 1301.)

With the general principles governing suppression motions at hand, we must now investigate whether the search of room 116 in the instant case was constitutional under the Fourth Amendment of the United States Constitution. ■ Since the passage of Proposition 8, evidence may only be excluded if exclusion is mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment of the United States Constitution rather than upon any independent provision in the California Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 894-896 [210 Cal.Rptr. 631, 694 P.2d 744].)

B. *Entry into the motel room to secure the .357 magnum.*

The superior court found "that the officers did have probable cause to enter into the [motel] room" but did not articulate the reasons supporting its conclusion. The evidence suggests two plausible theories:

1. *The officers had reasonable cause to believe the subject of the felony arrest warrant was inside.*

■ It is clear that the warrant for DeBenedict's arrest would have authorized officers to enter *his* residence to execute the warrant. ■ "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth

Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." (*Payton* v. *New York* (1980) 445 U.S. 573, 602-603 [63 L.Ed.2d 639, 660-661, 100 S.Ct. 1371].) *Payton* has been extended to authorize the arrest of a suspect in the home of another. (*United States* v. *Underwood* (9th Cir. 1983) 717 F.2d 482, 486.)

■ However, a homeowner's Fourth Amendment rights are violated when officers enter his home to arrest a guest pursuant to an arrest warrant. (*Steagald* v. *United States* (1981) 451 U.S. 204, 213-214 [68 L.Ed.2d 38, 46, 101 S.Ct. 1642].) A search warrant is required under such circumstances to protect the rights of the homeowner. (*Ibid.*)

■ We believe the officers were authorized to enter the motel room under the arrest warrant if at the time of entry they reasonably believed DeBenedict was a tenant and was present in the room. In *United States* v. *Manley* (2d Cir. 1980) 632 F.2d 978, the court held that a narcotic agent's entry into a dwelling to execute an arrest warrant on a person other than its owner or tenant is justified where the agent mistakenly but reasonably believed that the dwelling was the fugitive's and that he was present. (*Id.* at pp. 983-984.) Contraband observed in plain view after the justified entry was properly admitted to support the owner's conviction.

A search incidental to a mistaken arrest of the wrong person may be valid. In *People* v. *Hill* (1968) 69 Cal.2d 550 [72 Cal.Rptr. 641, 446 P.2d 521], police had probable cause to arrest Hill for robbery and kidnapping for the purpose of robbery. They went to Hill's apartment without a warrant, and Miller opened the door. The officers mistakenly but reasonably thought Miller was Hill (despite Miller's protestations to the contrary), arrested Miller, and searched Hill's apartment. The mistake in identity was later discovered and Hill was prosecuted and convicted from materials found in the search. The Supreme Court concluded: "In summary, we hold that the reasonable but mistaken beliefs of the police did not render their conduct unreasonable in a constitutional sense. Mistake of identity does not negate probable cause to arrest, and a search based on a valid but mistaken arrest is not unreasonable as an unwarranted invasion of either the arrestee's or the defendant's privacy. The evidence of Archie Hill's participation in the Studio City robbery which was the fruit of the search of his apartment was properly admitted. The judgment of conviction is affirmed." (69 Cal.2d at p. 555.)

The United States Supreme Court granted certiorari. In affirming, the court stated: "[T]he officers in good faith believed Miller was Hill and

arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." (*Hill* v. *California* (1971) 401 U.S. 797, 803-804 [28 L.Ed.2d 484, 490, 91 S.Ct. 1106].)

The United States Supreme Court recently concluded that a warrantless entry is valid when based upon the consent of a third party who the police, at the time of the entry, reasonably believe possesses common authority over the premises, but who in fact does not. (*Illinois* v. *Rodriguez* (1990) 497 U.S. __,__ [111 L.Ed.2d 148, 154, 110 S.Ct. 2793, 2796].) Writing for the majority, Justice Scalia noted: "It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable. As we put it in *Brinegar* v. *United States*, 388 U.S. 160, 176 . . . (1949):

" 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.' " (497 U.S. at p. __ [111 L.Ed.2d at pp. 159, 160, 110 S.Ct. at p. 2800].)

The evidence in the instant case supports a conclusion that the officers reasonably believed at the time of entry that DeBenedict was present in room 116 as a tenant. Officers had left DeBenedict's photograph with the motel manager and requested that she notify them if she observed him. A few days later she telephoned the police and notified them that she thought DeBenedict had just entered room 116. The officers immediately proceeded to the room. An occupant opened and immediately closed the curtains. Someone said, "It's the fucking pigs." Dyke finally opened the door part way. He appeared nervous and uncooperative. The officers observed a large caliber loaded handgun within arm's reach. Based on all of the evidence confronting the officers at the time of entry, they reasonably believed DeBenedict was present in room 116 as a tenant. They were entitled to enter the room pursuant to the arrest warrant.

However, the officers did not exercise their right to enter solely on the basis of the arrest warrant. Instead, they initially conversed with Dyke

regarding DeBenedict's presence. Their decision to enter was precipitated by observing the loaded .357 magnum within arm's reach of Dyke. They justified entry for the limited purpose of securing the handgun on the basis of exigent circumstances, specifically officers' safety. We now focus on this theory.

2. *Exigent circumstances justified the officers' entry.*

■ Respondent contends that the officers' reasonable belief that fugitive DeBenedict was in room 116 and their observation of the loaded .357 within arm's reach of Dyke, coupled with all of the other evidence, created exigent circumstances justifying their entry into the motel room for the limited purpose of securing the weapon.

■ " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].) The belief must be objectively reasonable. (*People* v. *Smith* (1977) 67 Cal.App.3d 638, 649 [136 Cal.Rptr. 764].)

■ There is no evidence that the officers' entry was a subterfuge to conduct a search for contraband. They had no reason to suspect that contraband was present in the room. Their only reason for going to room 116 was to execute the felony arrest warrant on DeBenedict, an act where time is of the essence. Their observation of marijuana in plain view after entry was fortuitous. (*Ker* v. *California* (1963) 374 U.S. 23, 42-43 [10 L.Ed.2d 726, 743-744, 83 S.Ct. 1623]; see *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 472-473, fn. 28 [29 L.Ed.2d 564, 586-587, 91 S.Ct. 2022].)

The presence of a handgun in a dwelling, in and of itself, obviously does not constitute an exigent circumstance justifying entry. However, the evidence is that the officers reasonably believed DeBenedict, the subject of their felony arrest warrant, was secreted inside and was aware of the reason for their presence. They were not obliged to wait and see if he or Dyke would reach for the handgun or otherwise try to escape. The totality of circumstances presented to the officers at the time of entry made their action of securing the loaded .357 magnum entirely reasonable. In assessing the reasonableness of challenged police conduct, we must balance the interests of all concerned. "Our zeal to fend off encroachments upon the right of privacy must be tempered by remembrance that ours is a government of

laws to preserve which we require law enforcement officers—live ones. Without becoming a police state, we may still protect the policeman's status." (*People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 27 [34 Cal.Rptr. 718].)

We conclude that the evidence justified the officers' entry into the motel room on both theories, i.e., (1) to execute the arrest warrant based on the reasonable belief that DeBenedict was a tenant and in room 116; and (2) exigent circumstances, based on all the circumstances, justifying entry for the limited purpose of securing the loaded .357 magnum within arm's reach.

C. *Entry into the bathroom was justified.*

■ Having entered and secured the .357 magnum, the officers observed a large quantity of marijuana, currency, and .22-caliber bullets in plain view on the bed. The question of whether the officers could then enter the bathroom is clearly answered by *Maryland* v. *Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093]. A warrant for Buie's arrest for armed robbery was executed at his home. After he was arrested upon emerging from the basement, an officer entered the basement " 'in case there was someone else' " and seized a red running suit Buie was wearing at the time of the robbery. The Supreme Court held that a protective sweep in conjunction with an in-home arrest is permitted when the officer has a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. (494 U.S. at p. __ [108 L.Ed.2d at p. 282, 110 S.Ct. at p. 1095].) The court stated: "We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* [*Terry* v. *Ohio* (1968) 392 U.S. 1] and *Long* [*Michigan* v. *Long* (1983) 463 U.S. 1032], and as in those cases, we think this balance is the proper one." (494 U.S. at p. __ [108 L.Ed.2d at p. 286, 110 S.Ct. at p. 1098], fn. omitted.)

An arrest of Dyke was in progress once the officers observed the large quantity of marijuana in plain view on the bed. They knew at least one person was secreted in the bathroom and they reasonably believed DeBenedict was in there. Whether the bathroom is "immediately adjoining the place of arrest" or not, it is clear from the record that the reasonable

suspicion standard of *Buie* was satisfied. They had the right to enter the bathroom and look behind the shower curtain and any other area therein that could harbor a person posing a danger. In doing so, contraband in the open paper bag was observed in plain view, including 432.70 grams of methamphetamine.

Alternatively, the officers were authorized under the arrest warrant to search for DeBenedict throughout the two rooms comprising room 116 if they reasonably believed he was a tenant and somewhere in the room. (*Maryland* v. *Buie, supra*, 494 U.S. at p. __ [108 L.Ed.2d at p. 285, 110 S.Ct. at p. 1097].)

We conclude the entry into the bathroom was justified under *Buie* and the contraband observed in plain view in the open paper bag was properly seized.

**D.** *Reentry into the bathroom after appellants were arrested and removed from the room.*

 Respondent correctly concedes that the officers' reentry and continued search of the bathroom were unjustified, as appellants had already been arrested and removed from the room, but contends the court's error in failing to suppress the 425.03 grams of methamphetamine contained in the baggie in the toilet was harmless as it was merely cumulative to the large amount already found in plain view.

We must separately examine the effect of this admitted error on the judgment entered against each appellant.

1. *Garland's judgment.*

Garland's judgment of conviction was based on guilty pleas to various charges after his section 1538.5 motion was essentially denied. Having concluded that the superior court erred in not suppressing the methamphetamine found in the toilet, Garland's judgment of conviction *must* be reversed. In *People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1], the Supreme Court stated:

"When, on an appeal from a judgment of conviction entered on a plea of guilty (§ 1538.5, subd. (m)), an appellate court determines that the trial court erroneously refused to suppress some but not all evidence, the situation is altered, no matter how slightly, from that which existed prior to the plea of guilty. The harmless error concept as a basis for according relief in such a setting is clearly inappropriate . . . .

". . . . . . . . . . . . . . . . . . . . .

". . . The accused must be afforded an opportunity to personally elect whether, contrary to the trial court's ruling, the suppression of certain items of evidence would alter the situation in a sufficiently favorable manner so as to render a plea of not guilty strategically preferable." (12 Cal.3d at pp. 768-769, fns. omitted.)

To accept respondent's contention that the error is harmless as to Garland would require us to disregard *People* v. *Hill, supra,* 12 Cal.3d 731, *People* v. *Rios* (1976) 16 Cal.3d 351, 358-359 [128 Cal.Rptr. 5, 546 P.2d 293], *People* v. *Miller* (1983) 33 Cal.3d 545, 556 [189 Cal.Rptr. 519, 658 P.2d 1320], *People* v. *Ruggles* (1985) 39 Cal.3d 1, 13 [216 Cal.Rptr. 88, 702 P.2d 170], and many Court of Appeal opinions. Garland must be afforded the opportunity to withdraw his plea, in which case the People are free to reinstate the original charges.

## 2. *Dyke's judgment.*

The judgment against Dyke resulted from a jury verdict finding him guilty on count 3 (conspiracy to possess for sale methamphetamine—§ 182, subd. 1) and count 4 (misdemeanor possession of marijuana—Health & Saf. Code, § 11357, subd. (b)), and finding true the eight overt acts alleged in support of the conspiracy. He was acquitted on count 1 of possession for sale of methamphetamine (Health & Saf. Code, § 11378) and on count 2 of possession of base or "rock" cocaine (Health & Saf. Code, § 11350, subd. (a)).

The effect of the superior court's error in not suppressing the methamphetamine found in the toilet must be assessed, as to Dyke's judgment, in accordance with the *Chapman* standard, i.e., "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The properly seized open paper bag on the bathroom floor contained 432.70 grams of methamphetamine. Additional contraband was properly seized in the motel room, at the residences, and in the personal possession of the appellants. The search warrants of the residences were not rendered invalid by the methamphetamine recovered from the toilet. Even if that evidence were excised from the affidavit, no different result could have occurred, and the warrants would have been issued based on the large amount of contraband lawfully obtained. ██ ██ Even if there was a defect in the search warrant of the two residences based on the methamphetamine recovered from the toilet, under *United States* v. *Leon* (1984) 468

U.S. 897, 922-925 [82 L.Ed.2d 677, 698-700, 104 S.Ct. 3405], evidence may not be suppressed when an officer acts in an objective, good faith reliance on a search warrant issued by a detached and neutral magistrate that is subsequently held to be invalid. The contraband at the residences was properly seized under the warrants.

Considering all of the evidence properly introduced, including the vast quantity of methamphetamine, we are convinced that the error in not suppressing the additional methamphetamine found in the toilet was harmless.

## II., III.*

. . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment against Donald Ray Dyke is affirmed.

The judgment against Richard Lee Garland is reversed and the cause remanded to the superior court. That court is directed to vacate the guilty pleas if Garland makes an appropriate motion within 30 days after this opinion becomes final. In that event, the court should reinstate the original charges contained in the amended information, if the state so moves, and proceed to trial or make other appropriate dispositions in accordance with the views expressed in this opinion. If no such motion is filed by Garland, the trial court is directed to reinstate the original judgment.

Best, P. J., and Dibiaso, J., concurred.

---

* See footnote, *ante,* page 648.